Good morning, David Centracchio, CENTRACCHIO, and I am here today and I have the honor and privilege of representing Felis Aspera, who is the plaintiff at Blount. Good morning. How long will your argument take? I anticipate meeting in approximately 20 minutes. Very good. Good morning, Kel. Good morning. Barry Whelan on behalf of the appellees Raul Munoz and RSJM Restaurant, and my argument will take approximately 15 minutes. Very good. Mr. Centracchio, you may proceed with your argument. Very well. May it please the court, counsel. On behalf of Mrs. Aspera, we are here today to ensure that her and all litigants that step into the courthouse prior to a trial are able to have what we all anticipate and everyone anticipates, and that is fundamental fairness. Every litigant that walks into the courthouse asks for a fair fight. At first blush, when they look at this case and say the plaintiff in a personal injury trial received a $300,000 verdict, she must have gotten a fair fight. However, when you take a look at the fact that she had over $150,000 of that medical, her injuries were literally from head to toe, which included 10 fractures, starting at the ankle all the way down to the leg, and that she had a traumatic brain injury. And that on that unfortunate day of July 13, 2007, when she left her house for a two-mile leisurely walk, she had no idea that she would not return back to her home until sometime in Thanksgiving, let alone return with injuries that would stay with her and limit her for the rest of her life. When we examined the record, there were three phases of this matter in which we believe that Mrs. Esparra was denied the fundamental fairness that she was entitled to in her trial. The first phase deals with the pretrial discovery. The second phase deals with the instruction of the jury as to the law. The third phase deals with the trial court's duty to control the lawyers that stuck before it. There is also two other facets to our appeal, which are the denial of the directed finding on behalf of plaintiff, and that the jury's verdict was against the manifest way to the evidence. I'm going to take the majority of my time to address the first three matters. Specifically in the pretrial, the basis of our appeal deals with the court's application of Rule 213. And it's not the rule itself that we're quarreling with, it's the application. And in this particular case, it's the context that it was applied in, specifically with respect to a treating physician. The rule takes into account when a party, such as a plaintiff in this case, has to disclose a treating physician. Specifically, the rule states that you ought to take into account the limitation on the party's knowledge of the facts known by, and the opinions held by, the witness. In this particular case, there was a disclosure made early on, timely, pursuant to 213, in which Dr. Patel, a treating physician, the surgeon at Mount Sinai Hospital, who saw her shortly after her visit in the emergency room and then into the admission into the hospital, he was disclosed, amongst other of his opinions, to have an opinion, eventually, that the conditions for which he treated her were permanent in nature. Specifically there were two conditions that we anticipated in the disclosure process that he would form an opinion that they were permanent in nature. She had a femur fracture, which required a pinning, and she also had a fracture in her hand that required a pinning. In the course of discovery and in the context of these disclosures, as usual, a plaintiff was deposed. At her deposition, she testified that both of those injuries continued to present her problems. The deposition of Dr. Patel was not taken by the defendants until 53 days before the initial trial date, which was set in December. This case was eventually tried just the following January, was given short continuance. Fifty-three days before trial, the defendant took the deposition of Dr. Patel. Simultaneously, the defendant was asking the court to continue, the trial court to continue this matter for trial, so that they had the opportunity to disclose their own 213F3 medical witness. Leading up to that deposition, defendants had already at their disposal the testimony of the plaintiff by way of her discovery deposition. As we cite in our briefs, by the end of Dr. Patel's deposition, he testified that based upon those two injuries that I have talked about, the leg and the hand injuries, that it was likely that she would have some type of limitations. However, as of the last time he saw her, she was still treating physical therapy, she was still having those problems, and by the very nature of the fact that he had not had the opportunity to see her again, he could not opine as to her current condition. He was asked, though, whether or not those type of injuries were likely to result in some type of permanent limitations, and he said, and I quote it in our briefs, at least as it relates to the leg, he says it's probable that it would. Is that an equivocal answer, counsel? Well, based upon what he had available to him, I believe that it's an answer, the only answer that he may have been able to give. It's a catch-22. Some doctors testify in practice and practical, some doctors can say it, some doctors want to see the patient. I believe it was an answer that put the defendants on notice, that he believed that the type of injury that she had likely could result in that, but wasn't going to say so unless he had the benefit of seeing her, which brings us to the Soto case. But in fact, he never said unequivocally that she had permanent injuries, is that correct? He did not at his deposition say, at his deposition, that he could give the opinion without seeing her that she had permanent injuries, true. Which made it necessary for you to supplement your 213 interrogatories, is that correct? Well, what we did is after we supplemented the 213 interrogatories by way of Dr. Patel's report, after he had a recent examination, because at that deposition, I specifically asked him, would it be necessary for him to have a recent examination for him to offer that opinion? Now given the fact that the supplemental answers did not come until December, was that reasonable notice of Dr. Patel's testimony? I believe so, particularly because the deposition was not taken by defendants until 53 days before December. It was already inside of 60 days of the trial date when they took Dr. Patel's deposition. But would it have made any difference since the doctor could not testify about permanent injuries? Well, I'm sorry, I don't understand the question. Would it have made any difference? Let me ask you this question. The doctor was not in a position 53 days out to say that the injuries were permanent, correct? So it really didn't make any difference when they took the deposition, correct? Well, it did make a difference between when they took the deposition, because one of the elements, if you take a look at the Sullivan, is surprise, and also the good faith of the parties. And in this particular case, as we argue, I don't believe there can be any surprise because what's incumbent upon the plaintiff is to make a disclosure, again, taking into account the limitations on the party's knowledge and the facts known by, and opinions that were going to be held by the witness. Is there anything that prevented Dr. Patel from examining the plaintiff prior to the deposition? Other than the fact that the plaintiff didn't have health insurance, no. Proceed. So under those circumstances, the plaintiff disclosed what was known to the plaintiff, and I think this is a critical fact. Going into Dr. Patel's deposition, defendants were aware of her testimony, her testimony that she, in fact, had the same limitations that Dr. Patel discussed in his depositions can happen. And in fact, when he did examine her, concluded that those limitations were permanent and as a result of the injury. So again, when I start talking about the pretrial phase, we, as plaintiffs, are in a bit of a quandary. We have to disclose what we expect opinions to be in light of the fact that there's also case law that says that if a doctor feels as though they need a recent examination, you have to have a recent examination. As you're traveling through the Daily Center and you're a plaintiff, what are you to do? Until you get a trial date, you don't know when your trial date is going to come. Does a plaintiff go and see a doctor a year before you think you're going to trial and then run the risk that a year is not a recent exam? Six months? Do you have to serially send plaintiffs? This is in the context of litigation. What happened in this particular case is all the information, the disclosures, it was not a surprise that he was going to testify to this. The initial disclosure, the very disclosure that was made the first time, actually set forth exactly what was offered at trial and barred by Judge Lynch. No different. There was no surprise. It was all on paper. It's just that the timing of it played out, in our opinion, part and parcel as a result of the defendant's election to wait until 53 days before the trial to take the deposition of Dr. Patel. After that, we acted quickly. As soon as we got the report, the same day it was faxed over to them. Moving on, the second, oh, and one other point that I'd like to bring on before I do that, as the solvent factors that we address, I would like to point out to the court that we, in fact, offered as well during the course, after the direct examination at the evidence deposition of Dr. Patel, the objection was raised by defendant as to his opinions being untimely pursuant to 213. At that point in time, we offered, I offered the opportunity to suspend the deposition at that point in time, allow defendant to take the deposition, instead of an evidence deposition, first give them the opportunity to take the deposition on the issue of permanency, and then they could continue with their cross-examination. So that opportunity was offered as well. And I think it's also important in review of the record to review Judge Lynch's explanation for why he barred. And I think it indicates that he clearly misunderstood the application of the rule when he said that instead of the term expect, we should have disclosed that we anticipate or we hope. That's not the import of the rule. All we are to do is to what we, it's explicit in that we are to disclose what we expect. Second portion of, that I want to address was the instructions. And generally, we took issue with the fact that certain 2001 issues instructions were tendered by the defendant, which were simply not supported by the evidence. Included in that is the second phase of our, there's two facets of the argument as it relates to instructions. One is the issues instructions, which is the 2001. The second is the 6001, which is the statute. They overlap in as much as the 6001, which was the statutory as to a pedestrian, quote unquote, suddenly leaving a curb, was also incorporated as an issue instruction in the 2001. However, setting aside the fact that there was no basis in fact that she suddenly stepped off the curb when it was placed into the 2001 as an issue, suddenly was left out. It didn't even track what the 6001 instruction was. Thereby leaving a jury to be instructed into the law that the plaintiff could be contributory negligent for leaving a curb, not even suddenly leaving a curb. And that's supposed to be the issues created by the law, the function of the trial court to make sure that the jury is properly instructed to the law. Not only the law, the law that applies to the facts. In this particular instance, some of the facts, or one of the issues that they got in is that she disobeyed a traffic. There was zero testimony, no testimony, one way or another, that there were any pedestrian walk, stop, signal signs. In fact, the unrefuted testimony was that the plaintiff, who was walking down 26th Street westbound, was crossing within a crosswalk. The defendant, who was going eastbound and intending to turn left on Kedzie, was, so in essence, they were going opposite directions, and the same thoroughfare, her as a pedestrian and the defendant as an operator of an F350 pickup truck. She walks undisputed, the light was green. She's walking in the crosswalk, on a green light, left hand turn truck, hits her. And without any suggestion of any evidence that there was any walk signs or anything, the court instructs, allows the jury to be instructed that one of the issues is that she disobeyed a sign. Again, if we look to the record and see what Judge Lynch said that justified his giving it, he used a term that he wanted to, he thought it was more appropriate to take the holistic approach in instructing the jury. I submit to this honorable court that that's not the way it's to be done. We leave a jury to decide what law applies to the facts, and I know it sounds a bit cynical, and a bit tongue-in-cheek in our brief, but it's true. We may as well just give jurors the entire Illinois Motor Vehicle Code, hand it to them, and let them decide what applies. That's the function of the court, and that's what the court failed to do in this particular instance. And it resulted in a woman, on a leisurely walk, in a crosswalk, admittedly by the defendant, light green, getting struck by a left hand turning truck, being found 10% at fault. I submit for what? Not anticipating that the defendant was going to be negligent? Finally, the last portion is the attorney's conduct, and this goes into the theme of what I believe was the defendant's closing and the court's failure to control the defendant after multiple objections raised during the course of the closing argument. Plaintiffs are always faced with a quandary when there's a closing argument and the defendant is stepping outside the bounds, especially when it is suggesting that plaintiffs are hiding evidence. The more we object in front of the jury, the more it makes us look as though we're trying to hide the evidence. So when that theme is being advanced by a defendant in litigation, the plaintiff, in order to preserve the record, must continue to object, but at the same time is playing right into the hands of the theme. That's why it is absolutely critical that when a trial judge sees or an objection is brought and there is the hint that one of the parties, that's an egregious theme to be raising against a litigant, that they're hiding evidence. And there must be control, and the Rutledge case talks about that. And in this particular instance, there was three instances in which defense counsel did that. The first dealt with the evidence that related to the police officer's testimony regarding the telephone call. We obtained telephone records that created the inference that the driver was in fact on a cell phone at the time. Officer Wolfer was called to testify just as to the timing that he arrived so that we that he was on the cell phone. That was allowed into evidence. What was not allowed into evidence on defendant's motion in limine was officer's testimony regarding his investigation, because he didn't witness the accident. In fact, the defendant pleaded the fifth when he was asked any questions by Officer Wolfer. Defense counsel admonished in open court, I quote it in our briefs, admonished in open court before Officer Wolfer said that he's not allowed to talk to anything other than his observations. We called him for the sole purpose of establishing the time. He was not cross-examined about his observations, yet in closing arguments, they make reference to you didn't hear anything about Officer Wolfer's investigation, you didn't hear anything about that, you've got to hold that against plaintiff. They also do it with respect to the telephone call itself. Well, where's the person that he was talking to on the other end of the line? There was a whole pre-trial discussion saying that we tried to call that number and it was disconnected. The only person that would have the knowledge of who the other person on the line was, was the defendant himself. Yet the defendant standing there before defense counsel, standing before the jury, accusing us when there was a motion in limine on this issue, barring any reference to a witness that was equally available to both parties, defendant stood there and accused the plaintiffs of not bringing in evidence they should. And then it culminates with photos. Where are the photos? There were no photos of the scene. Nobody took any photos of the scene. It's like, I was waiting for the next one, where's the DNA? There has to be evidence, what they try to couch the terms of is that we failed to prove our case, but none of this had anything to do with the case, it was designed because those facts weren't present or they were barred by a motion, it was entirely designed to cast the plaintiff in a light as a hiding evidence from the defendant. That denies parties fair trials and even though Mrs. Aspera was given $300,000, when you take a look at the grand picture, $151,000, I think they gave her $7,000 for loss of normal life, I have the numbers in there, a woman that wasn't even allowed to return to her home until Thanksgiving after July, $7,000 for loss of normal life. They cast the plaintiffs in a light that we're hiding evidence and did not allow us to have a fair trial. She was not allowed to have her doctor testify to the permanent nature of her injuries, which were clear and disclosed. So accordingly, we felt that she was denied a fair trial. Thank you. Thank you, counsel. Mr. Wayward. Good morning. May it please the court, counsel, I'm going to try and address the issues in the same order counsel did, so I'll start with the ruling that limited Dr. Patel's testimony in this case, and briefly, I'd like to go through the timeline of the disclosure, because I really think that gets to the heart of the issue, which is the timeliness of the disclosure. The original answers to F2 interrogatories were filed on December 7th, 2009. The plaintiffs noted that they expected Dr. Patel to testify that the plaintiff's condition is permanent, and they expected Dr. Patel to examine the plaintiff to the extent necessary to give an opinion with permanency. About ten months later, October 2010, the discovery deposition of Dr. Patel is taken. At that time, Dr. Patel testifies that the last time he saw the plaintiff was three years prior in October of 2007. He testifies that since he hasn't seen the plaintiff, he cannot give an opinion on her current condition. He testified that the last time he saw her, he thought she had good prognosis and would not need any further surgery. Again, this is December 2010, just a few months before the trial. The next day, a court order is entered, giving the defendants three weeks to name an expert. That was to be done by November 11th of 2010. The defendants weighed Dr. Patel's testimony and chose not to retain an expert. So essentially, as of November 11th, 2010, discovery is closed. We're two months out of trial. The plaintiff then goes in to get an exam from Dr. Patel on December 13th, 2010, about a month after discovery closes and just a few weeks before trial. The results of that exam are disclosed on December 28th, now we're two weeks from trial, in a report, and they disclose the new exam, which provides a new basis for Dr. Patel's new opinions, which are that he does now have an opinion on her current condition and that she does have residual problems, permanent problems, and that she may need surgery in the future. That's a stark contrast to what he testified to a few months earlier. Essentially, what we have is a month after discovery is closed, we get a new exam, new opinions, and they're disclosed essentially on the eve of trial. And your position is that was in reasonable notice? Exactly. I think Rule 213 and the discovery schedule set by the courts seek to prevent this exact situation. They talk about unfair surprise and prejudice. I think this is the exact situation they're talking about. When you get a disclosure on the eve of trial, after the expert discovery cutoff is passed, the party's left with no way to respond to this new evidence, and we're just a few weeks outside of trial. I think the trial court noted that in its ruling, talked about the lateness of the disclosure, the surprise, the prejudice, and the defendants weren't able to retain an expert to rebut this. And I think they made a proper ruling, and they limited Dr. Patel's testimony to what he gave at his discovery deposition just a few months before trial. The plaintiff has argued that they're in a catch-22, and essentially they're arguing that they're left with two choices. Either get an exam a few weeks before trial, or the doctor can't testify to permanency. They cite to the Soto case for that argument, and Soto does discuss getting a recent exam on some cases in order to testify to permanency, but they also go out of their way to say that's not a bright-line rule. It's going to be a totality of the circumstances analysis, and I think what the plaintiff has done is presented a little bit of a false dichotomy here. The only two options aren't get an exam a few weeks before trial, or there's no testimony regarding permanency. The other option is to get an exam while discovery is ongoing, when F-2 discovery is open. Disclose that exam. The deposition of the doctor is then taken, and the doctor testifies that based on this exam that I just had, these are my opinions regarding her current condition and permanency. At that point, it's in the deposition transcript, discovery continues, defendants are afforded an opportunity to get an expert to rebut that testimony, and that testimony comes in that trial consistent with the deposition transcript. I think that's a perfectly reasonable option as compared to getting an exam two weeks before the trial date. With regards to the Sullivan factors, those are surprise, prejudicial effect, nature of the testimony, timeliness of the objection, and good faith of the party. I think it's pretty clear that the court did take those into consideration. The court talked about the timeliness of the disclosure, the surprise and prejudice, and the defendants couldn't get an expert, and the defendants objected on January 5th, 2011, and the disclosure was made on December 28th. So I think when you look at those factors, they clearly tip in favor of the defendant. I think it's pretty clear from the wording of the ruling that the trial court did consider those factors. The next issues I'll address are the jury verdicts, and basically, I apologize, the jury instructions. And basically, the argument the plaintiff is making is that there wasn't sufficient evidence to support those instructions. Specifically, there wasn't specific evidence for contributory negligence. And briefly, I'll go through the accident. There was a four-way intersection. Defendant's traveling east, he's going to make a left turn to go north. The plaintiff is crossing on the north side of the intersection. The plaintiff, so we submitted jury instructions that identified four different categories of her contributory negligence. The first was failing to keep a proper lookout. Second was she was outside the crosswalk at the time of the accident. Third was she left the curb or place of safety when there was imminent danger. And the last one was disobeying the traffic control lights. With regards to the proper lookout, the plaintiff testified that she got to the corner, looked, saw the defendant ready to make a left-handed turn into her path. She testifies that the next time she ever looks at the defendant is when the impact occurs. So, essentially, she's saying, I saw that the defendant was going to make a left-hand turn into my path, never looked at him again, and walked blindly into the intersection. I think that's pretty sufficient evidence of failure to keep a proper lookout. With regards to being outside of the crosswalk, there was testimony that she was in the crosswalk, but there was also the plaintiff testifying that she was hit by the front part of the truck. And the defendant testified that when the impact occurred, the front of his truck was past the crosswalk. So, if you put those two pieces of testimony together, I think you can draw the inference that the plaintiff was outside the crosswalk. The next category was leaving the curb or place of safety when there was an imminent danger. Again, the plaintiff testified she saw the defendant was about to make a left-hand turn into her path and left and walked into the intersection. The defendant also testified that he was keeping a proper lookout and never saw the plaintiff in the intersection. Again, I think when you look at that testimony, you can very easily draw the conclusion that the defendant was already in his turn and the plaintiff walked into that path. The last portion is disobeying the traffic control lights. And in this area, the plaintiff simply testified that the traffic lights for east and westbound traffic were green and so were the traffic lights for north and southbound traffic. We know that both of those lights cannot be green at the same time. I think that's up to the jury to assess the credibility of the witness and to determine which light was green. If the north-southbound light was green, then the plaintiff would have been crossing against a red light and she would have been disobeying the traffic light. Again, this isn't the strongest evidence of contributory negligence I've ever seen, but I think it's accurately reflected in the jury's verdict that reduced it only by 10%. The last issue I'd like to discuss is the comments that were made during closing argument. And there's really two issues here. One, were the comments proper? And two, was the plaintiff given a fair trial? The plaintiff argued that based on circumstantial evidence, the defendant was on the phone at the time of the accident. They point to the phone records and the estimate of the time of the accident given by Officer Wolford. And Officer Wolford testified that it's exactly that, an estimate of the time of the accident. Defense counsel argued in closing that there was no evidence of when the 911 call came in. There was no evidence of when police received the call or when Officer Wolford was dispatched. All that argument is doing is testing the weight and sufficiency of Officer Wolford's estimate, the time of the accident. The last comment counsel made on that issue was that the plaintiff could have brought someone in to testify that they were on the phone with the defendant at the time of the accident. And the plaintiffs discussed the Rutledge case, which does state that it's not appropriate for counsel to comment on the failure of a party to call a witness that's not in the party's control. And in the Rutledge case, there was a doctor involved in the case. He was sick at the time of trial. The party stipulated that he was sick and would not be called. The jury hears about this doctor, but he's never called. And then defense counsel asked why didn't the plaintiffs call this doctor, creating the inference that he was adverse to them. I think that's different than what happened here. There's no specific witness that was identified. There was no witness that the jury heard about. And then counsel commented that no party called him. Instead, what happened here is that counsel was merely commenting that there is no witness. There is no person on the other end of that line, because no phone call was being made during the time of the accident. And I think that's a big distinction from commenting on a witness that the jury knows about in creating an adverse implication. Lastly, all the arguments that the plaintiff cites to are arguments about the defendant's negligence. In the Rutledge case, the plaintiff obtained an adverse verdict, and the court said the plaintiff was denied a fair trial because of all these comments by defense counsel. Here, the plaintiff obtained a verdict on negligence. I think it's hard to say that she was denied a fair trial based on these comments. And with that, unless there are any questions, I will rest on those arguments, and those are my brief. Thank you, counsel. Mr. Whalen. Thank you. Mr. Centracchio, do you have some rebuttal? I'll start off in rebuttal just to discuss the 213 issue again. And counsel brings up an interesting point when he talks about the totality of the circumstances. And when you take a look at the totality of the circumstances and what was done in this case and disclosures that were made, it is irrefutable that the offer of proof for Dr. Patel's testimony was consistent with the 213F disclosure made by the plaintiffs, originally disclosed. Absolutely 100% consistent. Disclosure itself contained the following disclosures. Plaintiff's condition is permanent, and the scar causes disfigurement as well as restrictions of motion, including but not limited to pain and stiffness in her left hand. This is the original disclosure. The doctor is also expected to testify to the plaintiff's prognosis for the future and also discloses he is further expected to examine the patient to the extent necessary to comply with current case law so as to offer an opinion as to permanency at trial. That was a disclosure made on 12-7-2009, 10 months before they took the deposition. Totality of the circumstances. They also knew, and it's cited in their, and I'm not going to read it all, but of Mrs. Aspera's testimony at her deposition, where Mrs. Aspera said that, yes, I have problems with my hand. I can't walk up and down stairs. I have to use a cane to walk. That was information, totality of circumstances, that they had available to them. When they stepped into that deposition 53 days before the original trial date, with the anticipation at that time that they were going to disclose a 213F3, because I remind you, they asked for additional time to do so. It was only after Dr. Patel testified that I need a recent exam, which was disclosed, that they decided as a trial tactic, because they still had the opportunity to name a 213F3, not the name the F3, to claim surprise and seek to bar the opinions which were in fact disclosed. As such, we believe the plaintiffs complied, especially because the rule anticipates this. There are limitations on parties' knowledge, especially with F2 witnesses. It's not as though doctors are happy that plaintiffs' lawyers are picking up the phone and asking them questions or trying to get them on the phone related to some litigation. There are limitations. That's why the disclosure is done in this form, and I implore this court to consider that, because this ruling could have a huge impact on every single case in which there's permanency. What do we do? A year out, do we decide that we're going to send it, and the case takes three years, and then I'm fighting a SOTO motion at trial that the year-recent exam was three years ago, and then have to send another one a year after? You want to talk about unnecessary health care? I mean, in the old days, we used to have recent exams in the conference room, the jury room, or the conference room in the courthouse, before the doctor took the stand so they can comply with the rule. Especially when you have all the facts at the disposal that indicates there's a permanent injury. This woman, like it wasn't bumps and bruises. It's not soft tissue. This lady had pins and rods in her leg. She had surgery, scars. Of course the doctor's going to say, the doctor's just being honest. Limitations. I need to see her to tell you how she's doing. And we did that, and we disclosed it, but we weren't allowed to present that to the jury. So here's a woman who's going to have these problems for the rest of her life, and I'm not able to present to the jury. Ladies and gentlemen of the jury, her surgeon stood before you and told you that she's going to have these problems for the rest of her life. She's going to have to use a cane for the rest of her life. Can't walk upstairs without it. We were barred from presenting that. Next thing. The impact. Talking about the turning and the negligence and the 10%. So counsel says that she failed to properly keep a proper outlook. I mean, his analogy is, or what I can analogize that to, is if I'm driving down Kedzie, and there's a westbound car, and I'm going eastbound, and I see that westbound car about, oh, half mile up. I see it coming. I'm aware that it's coming. Unexpectedly, it crosses the center line and hits me head on. And I said, I didn't see it. I didn't know what happened. It just hit me. Came across the line. Hit me. Am I 10% at fault? Because I didn't keep an eye on it all the way? That's what a reasonable person would do. You have a reasonable expectation when you're obeying the law, driving down the road, or walking within a crosswalk that you have every right to. And we cited at the beginning of our facts, the very first questions asked. And in the record of Mr. Munoz, as an adverse witness, was she in the crosswalk at the time that you struck her? Yes. And then we're getting instructions about people being outside the crosswalk, about suddenly leaving curbs. The light was green. On the backdrop of the third, the comments that were brought out. I want to read. I know counsel is putting, for lack of better words, a spin on what was said and the import of what was said. I want to read again exactly what was said with respect to the 9-1 phone call. And I quote, Plaintiffs could have brought in somebody who could have testified, yes, I was on the telephone with Mr. Munoz when he was involved in an accident. What is a juror expected to believe when somebody says plaintiffs could have brought somebody in to testify? There's but one inference for a juror to come to. That is, somebody was out there that could have verified this and plaintiffs didn't bring them in. That's precisely why we file motions. That's precisely why we have an instruction 501. It's to prevent this type of gamesmanship. To place people, the litigants, in a position where they have to defend what they're doing, which is right. So as a result, we believe that when you take a look at the total circumstances, this verdict, albeit $300,000, should have been much higher, and as a result of all these issues, Mrs. Esparra was denied her fair day in court. Thank you for your time and consideration. Thank you, gentlemen. Let me ask one question. Yes. What do you think your strongest issue on appeal is? I think all three are, I really believe that the jury instruction, I mean, from a practical standpoint, I feel as though since this court sits in a position to basically oversee what trial courts do, and as a trial lawyer, I like trial courts to have mandates to know what they need to do and not to do, and to me I think the most glaring is that we have a trial judge that's holistically instructing jurors, but at the same time, 213 is when you disclose and in good faith you do what you think you need to do to comply with 213, and you're getting barred when it's all out there on the table, and there really were no surprises. I really believe that's where she, where my client was most prejudiced, was in the 213 disclosure permanency, where I think the most glaring and most troubling problem to me is when jurors are instructed holistically. Thank you. Thank you. I want to compliment the attorneys on their briefs and their arguments. This matter will be taken under advisement, and this court is going to stand in recess.